JACKSON NATIONAL LIFE INSURANCE COMPANY and Jackson National Life Insurance Company of Michigan, Plaintiffs,

v.

Louis LIGATOR, Allison Industries, Inc., Allison Industries, Ltd., Hybritex de Costa Rica, S.A., Motor Parkway Realty Corp., Melvin Smith, James J. Hume, Stuart Stein, Shai Nesher, Mario de La Higuera, and John and Mary Does 1–100, Defendants.

No. 95 Civ. 9532 (LAP).

United States District Court, S.D. New York.

Dec. 24, 1996.

---

**2.** It is unnecessary to reach the issue of prejudice under Fed.R.Crim.P. 14, because joinder is not proper under Fed.R.Crim.P. 8(b).

dants Motor Parkway Realty Corp., James J. Hume.

### MEMORANDUM AND ORDER

PRESKA, District Judge:

This is an action alleging securities fraud, common law fraud, negligent misrepresentation, and fraudulent conveyance in connection with a complex transaction involving the plaintiffs' provision of financing to facilitate the purchase of stock and assets of a group of related businesses allegedly owned or controlled by the various defendants. Defendants Motor Parkway, Inc., Melvin Smith, Stuart Stein, Louis Ligator, Allison Industries, Inc., Allison Industries, Ltd., and Hybritex of Costa Rica, S.A. have brought four different motions to dismiss, relying on Fed. R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b). For the reasons that follow, the complaint is dismissed without prejudice for failure to state a claim upon which relief can be granted.

### BACKGROUND

On June 16, 1995, IPM Products Corporation, a corporation formed and controlled by H.I.G. Capital Management, Inc. ("HIG"), purchased the "IPM Entities," a group of related businesses allegedly controlled by the defendants herein, for $41 million. (Second Amended Complaint, ¶ 2). On that date, pursuant to a Revolving Credit and Term Loan Agreement, plaintiffs financed $33.3 million of the purchase price by acquiring debt and equity in IPM Products Corporation and its parent company, IPM Products Company. (Second Amended Complaint, ¶ 2).

Jackson National's investment was allocated as follows:

(1) $13.3 million Senior Secured Revolver Loan, due June 16, 2002;

(2) $12.0 million Senior Secured Term Loan, due June 16, 2002;

(3) $7.4 million Senior Subordinated Notes, due June 16, 2003;

(4) $500,000.00 of common stock and warrants.[1]

Steven Cooper, Anderson Kill Olick & Oshinsky, P.C., New York City, for plaintiffs Jackson National Life Insurance Company, Jackson National Life Insurance Company of Michigan.

Jonathan Sinnreich, Sinnreich, Wasserman Grubin & Cahill, New York City, for defen-

---

1. Despite plaintiffs' allegations in other paragraphs that the financing amounted to $33.3

million (see, e.g., Second Amended Complaint,

(Second Amended Complaint, ¶ 28). In addition, Jackson National alleges that at some unspecified date after the closing date, it provided additional advances of $1.45 million "pursuant to the Revolver Loan facility." (Second Amended Complaint, ¶ 29). After the closing date, Jackson National was the only creditor of, and a 12% equity owner of common stock and warrants in, the companies holding the stock and assets of the IPM Entities. (Second Amended Complaint, ¶ 30).

Plaintiffs charge that the "Ligator Defendants," a term that apparently comprises all of the defendants, employed a variety of stratagems to inflate the IPM Entities' operating income by some $3 million, thereby inflating the purchase price by $21 million. (Second Amended Complaint, ¶ 4). Among the techniques plaintiffs allege were used to achieve this aim were the entry of fictitious inventory credits, the intentional failure to reflect certain expenses, and the recording of false sales in the IPM Entities' accounting ledgers. (Second Amended Complaint, ¶ 4). In addition, plaintiffs charge that the Ligator Defendants purposefully failed to disclose that one of IPM Entities' largest customers, Blue Chip Products Co., was experiencing serious financial trouble and would not be a significant source of future revenue. (Second Amended Complaint, ¶ 5).

Jackson National claims that it received this allegedly false and misleading information during the period that it was meeting with and negotiating with HIG regarding the proposed acquisition. (Second Amended Complaint, ¶ 36). At that time, "Jackson National posed numerous questions to, and requested various documents directly and/or indirectly about the IPM Entities from the Ligator Defendants and H.I.G." (Second Amended Complaint, ¶ 36). Within this time period, on March 24, 1995, representatives of Jackson National met with "representatives of H.I.G. and the Ligator Defendants, including Hume." (Second Amended Complaint, ¶ 37). According to plaintiffs, at this meeting, the Ligator Defendants stated that the IPM Entities were profitable and financially sound, provided sales, cost, cash flow, profita-

bility and inventory figures for the IPM Entities, distributed balance sheets, income sheets and various other financial data regarding the IPM Entities, and assured Jackson National of the accuracy and completeness of the information provided. (Second Amended Complaint, ¶ 37). Thereafter, Jackson National requested additional information, including the latest available sales and profit figures, inventory, accounts receivable, and accounts payable figures, and a history of inventory write-offs and write-downs, as well as an opportunity to speak with IPM Entities' largest customers, including Blue Chip. (Second Amended Complaint, ¶ 38). This further information was allegedly received "directly or indirectly" from the Ligator Defendants. (Second Amended Complaint, ¶ 39).

Jackson National had other sources of information besides the Ligator Defendants, however. At one point during the negotiations period, Jackson National retained Coopers & Lybrand, an independent accounting firm, to review financial information concerning the IPM Entities. (Second Amended Complaint, ¶ 38). At an earlier time, in January, 1995, H.I.G. hired Ernst & Young, LLP, "an internationally known accounting firm," to "review[ ] and analyz[e] the operational and financial affairs of the IPM Entities." (Second Amended Complaint, ¶ 33).

Nonetheless, plaintiffs allege that it was not until shortly after the closing was complete that "the Ligator Defendants' fraudulent scheme began to come to light." (Second Amended Complaint, ¶ 6). Initial post-closing earnings proved to be less than half of what had been projected based upon the information allegedly provided by the defendants. (Second Amended Complaint, ¶ 47). Plaintiffs claim to have become aware at that point of the widespread fraudulent conduct, including the fictitious entries in the IPM Entities' financial records discussed above. As a result of what plaintiffs characterize as defendants' securities fraud, common law fraud, negligent misrepresentation and fraudulent conveyances, "[p]laintiffs' $34 million investment in the securities of IPM Products Corporation has been rendered val-

¶ 2), I note that these figures add up to only $33.2 million.

ueless, or has substantially lost its value due to the unlikelihood of full repayment." (Second Amended Complaint, ¶ 81). Plaintiffs also allege that IPM Products Corporation has not paid interest to Jackson National since August of 1995 (although they notably fail to allege that any such payments were due), and that the only interest payments that were made were the result of an advance on the revolver loan. (Second Amended Complaint, ¶ 7).

Dissatisfaction with this complex, not to say convoluted, transaction has spawned a variety of legal actions, including the instant suit. On February 23, 1996, Jackson National brought suit against IPM Products Corporation and IPM Products Company in the Supreme Court of the State of New York, New York County, seeking a recovery of $35,558,871.86. (Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss, p. 18 n. 8). Whether any funds are available towards a potential recovery in that action may turn on the resolution of an arbitration commenced by HIG and IPM Products Corp. against Louis Ligator, Allison Industries, Inc., Allison Industries, Ltd. and Motor Parkway Realty Corp. on August 16, 1995. (Second Amended Complaint, ¶ 8 n. 2).

In addition, of course, Jackson National brought the present action on November 8, 1995, alleging common law fraud, violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, violations of § 20(a) of the Exchange Act, negligent misrepresentation, and fraudulent conveyance. Various defendants moved to dismiss, relying on Fed.R.Civ.P. 9(b) and Fed.R.Civ.P. 12(b)(6). While I harbor grave doubts about whether the Second Amended Complaint in this action meets the particularity requirements of Rule 9(b), I am deciding the instant motions exclusively on the Rule 12(b)(6) grounds. Because plaintiffs' claims are entirely derivative of any damages sustained by IPM Products Corporation and IPM Products Company, and because any assessment of damages at this time is both premature and unduly speculative, the action is dismissed without prejudice.

## DISCUSSION

### I. Standard Applicable to a Motion to Dismiss

In deciding this motion to dismiss, I must view the complaint in the light most favorable to plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974); *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir.1985). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of the plaintiffs. *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). A motion to dismiss can only be granted if it appears beyond doubt that the nonmoving party can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Even under this liberal standard, however, the within plaintiffs' claims clearly suffer from deficiencies that require their dismissal at this time.

### II. Jackson National's Claims Are Derivative

From the outset of this action, I have been concerned about the prospective dangers of a "double recovery." As I stated in my January 19, 1996 oral decision:

> Jackson National loaned IPM approximately $33 million to purchase the IPM entities. Both parties now claim that they were injured because the $41 million purchase price was inflated by Ligator's alleged misrepresentation and fraud. Both parties' claims are supported by the same legal theories. Both refer to the same property, namely the stock and assets of the IPM entities, and both seek to rectify or recoup the alleged overpayment. It is a distinction without a difference to argue, as plaintiff does … that "Jackson's property interest in this action concerns its own injuries, not IPM's or H.I.G.s. [sic]"

(1/19/96 Tr., pp. 46–47). As I pointed out then, and as plaintiffs conceded, if plaintiffs and IPM and HIG were both to prevail in their respective actions, the result would be duplicative awards. (1/19/96 Tr., p. 13). The specter of a double recovery has gained in menace since I rendered that decision, because a little over one month later, Jackson National commenced an action in New York Supreme Court against IPM Products Corporation and IPM Products Company, seeking the same recovery sought from the "Ligator Defendants" in this case.

Numerous courts, including the United States Supreme Court and the Court of Appeals for the Second Circuit, have recognized that the type of secondary standing claimed by Jackson National here is disfavored precisely because it can lead to double recovery, as well as because the necessary causal link between the actions of the primary violator and the party claiming injury is too remote. In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), for example, the Supreme Court examined the propriety of a suit brought by the Securities Investor Protection Corporation ("SIPC") against former members of a brokerage firm that allegedly engaged in stock manipulation. The SIPC claimed that the defendants had manipulated the stock of several companies "by making unduly optimistic statements about their prospects" and by continually selling shares in the subject companies to create the appearance of a liquid market. Several broker-dealers, who were SIPC members, bought substantial amounts of the manipulated stocks with their own funds. When the scheme inevitably collapsed, the stocks plummeted. *Id.* at 262, 112 S.Ct. at 1314–15. This decline caused the broker-dealers to experience severe financial hardship, which ultimately led to their liquidation. *Id.* The SIPC advanced nearly $13 million to cover claims by the customers of the affected broker-dealers and sued the alleged participants in the fraudulent scheme to recoup its outlay.

The Supreme Court assumed, for the sake of argument, that the SIPC was entitled to stand in the shoes of the customers but held that "the link is too remote between the stock manipulation alleged and the custom-ers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271, 112 S.Ct. at 1319. "[T]he conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Id.*

The Court recounted the difficulties inherent in calculation of the damages owed to a remotely injured party and noted that "the law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication." *Id.* at 273, 112 S.Ct. at 1320. Pointing out that the broker-dealers had in fact already sued, in the person of their trustee, the Court determined that "SIPC must wait on the outcome of the trustees' suit." *Id.* at 274, 112 S.Ct. at 1321. One of the reasons cited by the *Holmes* Court in favor of its restrained approach was the need to "obviate the risk of multiple recoveries." *Id.* at 269, 112 S.Ct. at 1318.

Similarly, in the present case, the directly injured parties are the actual purchasers of IPM Entities—IPM Products Corporation, IPM Products Company, and HIG. As in *Holmes*, Jackson National's injury arises only from the alleged wrongdoing by the defendants that left the intermediary companies—IPM Products and HIG—without the wherewithal to repay the financing provided by Jackson National. As in *Holmes*, the directly injured parties have sought legal recourse, in this case in the form of arbitration. No reason readily appears why Jackson National should not likewise await the outcome of that arbitration.

The Second Circuit has taken its cue from the Supreme Court and denied standing to sue to indirectly injured parties. In *Manson v. Stacescu*, 11 F.3d 1127 (2d Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994), for example, the Second Circuit upheld the district court's finding that where a creditor of a corporation sustains injury only because of the debtor's inability to pay an obligation, the creditor's injury is derivative of the corporation's; the

creditor therefore lacks standing to sue. *Id.* at 1130. Similarly, a shareholder who suffers a derivative injury generally lacks standing to bring suit, even when that plaintiff is the sole shareholder of the directly injured corporation. *Id.* at 1131. This rule against suit by remotely injured parties, the court noted, "serves the interests of judicial economy by allowing courts to determine ... one damage award that will restore the corporation and, therefore, its shareholders, creditors, and employees." *Id.* at 1132.

In *Paris Partners, L.P. v. Russo,* No. 94 Civ. 5684 (PKL), 1995 WL 746585 (S.D.N.Y. December 14, 1995), the court addressed the recourse of a remotely injured party in a multi-layered transaction very similar to the one at issue here, in light of the Supreme Court and Second Circuit precedents discussed above. The plaintiff was a limited partnership which was the primary shareholder of Recovery Corporation of America, Inc. ("RCA"). RCA, in turn, was a holding company of several wholly-owned subsidiaries that contracted with yet a third entity, Medical & Hazardous Waste Management Corporation ("MHW"). *Id.* at *1. Defendants were officers and directors of MHW, who allegedly made fraudulent misrepresentations that caused some entity (RCA or a subsidiary) to purchase MHW. *Id.* Plaintiff's suit was based on the following chain of inferences: based on the misrepresentations, plaintiff advanced money to RCA, both in the form of equity investment and loans; MHW was rendered insolvent and unable to pay its debts to RCA or its subsidiaries; therefore RCA was diminished in value and plaintiff was ultimately forced to sell its investment in RCA for some nominal amount. *Id.* The court in *Paris Partners* reiterated the rule that "where a claimed injury is derivative of another person's primary injury, the claimed injury is not proximately caused by the ... violation and therefore there is no standing...." *Id.* The court found that "the rationale for barring derivative plaintiffs is sound" and noted that RCA or its subsidiaries were injured only because MHW was looted by the defendants. *Id.* at *2. As a purely derivative claim, this injury was inadequate to confer standing to sue. The court characterized the plaintiff's attempts to cast its injury as direct and distinct from those suffered by RCA as "border[ing] on the frivolous." *Id.*

The attempt of the plaintiff in *Paris Partners* to redefine its injury, like the similar endeavor undertaken by the plaintiffs in this case, results from the recognition by the Court of Appeals of certain narrow exceptions to the above-described rules of proximate causation, none of which applies in this case. The plaintiffs rely on two cases in particular in support of their argument that they have suffered a direct injury sufficient to support an independent cause of action, *Banker's Trust Co. v. Rhoades,* 859 F.2d 1096, 1100–01 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989) and *GICC Capital Corp. v. Technology Finance Group, Inc.,* 30 F.3d 289 (2d Cir. 1994). Neither is availing.

In the context of suits both by creditors and by shareholders of directly injured corporations, the Court of Appeals has recognized a right to sue where the plaintiff sustains a direct injury that is separate and distinct from the injury suffered by the corporation. *See, e.g., Manson,* 11 F.3d at 1130 (explaining *Banker's Trust* in the wake of *Holmes* as permitting a creditor to sue who had been forced to defend frivolous suits which caused monetary loss "over and above that caused by the company's bankruptcy"); *Ceribelli v. Elghanayan,* 990 F.2d 62, 63–65 (2d Cir.1993) (recognizing an exception to the general rule against shareholder actions that is limited to cases where the shareholder suffers a separate and distinct injury); *see also Paris Partners,* 1995 WL 746585, at *1 (characterizing *Banker's Trust* as awarding standing to a creditor who had been "directly injured in having to defend against frivolous suits"). In the present case, Jackson National has suffered no separate and distinct injury. In fact, if HIG and IPM Products Corporation and IPM Products Company are made whole and are able to fulfill their obligations under the notes, Jackson National will have suffered no injury at all.

While *GICC* does seem to represent something of an intra-circuit split from *Mason,* its facts differ so widely from the present case

that it provides no support for the plaintiffs' position. In *GICC*, the primary injured party was TFG, the debtor of the plaintiff, but there was no realistic possibility that TFG would bring suit "for the law's vindication." *Holmes*, 503 U.S. at 273, 112 S.Ct. at 1320. As the Court of Appeals noted, "TFG released [the defendant] from all claims that TFG might have had against [the defendant]. TFG's officers and directors resigned. TFG thus was cast adrift without recourse against" the defendant, its subsidiaries, or controlling persons. *GICC*, 30 F.3d at 291. *GICC* thus represents the anomalous case where the primary injured party lacks the ability to sue. Suit by the derivatively injured party may be the only means to an equitable resolution in such a case; significantly, there exists no risk of double recovery. In the present case, however, no danger exists that IPM Products Corporation, IPM Products Company, or HIG will be unable or unwilling to bring suit; as mentioned above, the directly injured parties have already commenced arbitration proceedings against the defendants.

At oral argument, plaintiffs' counsel belatedly indicated that plaintiffs were relying on *Department of Economic Development v. Arthur Andersen & Co.*, 924 F.Supp. 449 (S.D.N.Y.1996) and cases cited therein in support of his contention that remotely injured shareholders can maintain a cause of action if the fraud induces them to make their initial purchase of shares. *See id.* at 464 (citing *In re Colonial Ltd. Partnership Litig.*, 854 F.Supp. 64, 105 (D.Conn.1994); *Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104, at *3 (S.D.N.Y. March 23, 1994); *Dayton Monetary Assoc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, No. 91 Civ. 2050, 1993 WL 410503, at *2 (S.D.N.Y. October 14, 1993)). Each of these four cases, however, represents nothing more than the courts' allegiance to the rule stated in *Ceribelli v. Elghanayan*, 990 F.2d 62 (2d Cir. 1993) that a plaintiff can maintain an action if he suffers an injury that is separate and distinct from the injury sustained by the directly injured corporation. I have no quarrel with that rule, or its application in the cited cases, but it is simply not applicable in the present case.

In *Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette*, for example, Judge Stanton distinguished plaintiffs' RICO claims from their claims based on fraudulent misrepresentation. 1993 WL 410503, at *1, *2. The reason for this distinction is clear: the fraudulent misrepresentation caused no injury to the limited partnership (which could actually have been flattered at the overstatement of its worth) but did damage the purchasers. *Id.* at *2. The RICO causes of action, by contrast, arose from injuries directly to the limited partnership which damaged the shareholders only by decreasing the value of their investment. *Id.* at *1. The plaintiffs therefore lacked standing to sue under RICO but had the necessary standing to bring suit on the basis of the allegedly fraudulent misrepresentations.

Each of the other cases cited by plaintiffs involves a similar paradigm: the defendant allegedly made misrepresentations concerning the value of a corporation as an investment, and the plaintiffs purchased shares in the very entity whose worth was misrepresented, to their detriment. *See Department of Economic Development*, 924 F.Supp. at 454–55; *In re Colonial Limited Partnership Litig.*, 854 F.Supp. at 78–79; *Friedman v. Hartmann*, 1994 WL 97104, at *1. In such a case, because there is no identity of interest between the entity and the investors, there exists no risk of double recovery. This case is manifestly distinct. Here, accepting plaintiffs' allegations as true, the defendants misrepresented the value of the IPM Entities. Plaintiffs, in reliance on that misrepresentation, made loans to and bought a minority of the shares of IPM Products Corporation and IPM Products Company. Those intermediary companies, and not plaintiffs, were the direct purchasers of the IPM Entities and are the directly injured parties in this transaction. Because plaintiffs have plainly suffered no injury that is separate and distinct from the alleged damage to IPM Corporation and IPM Company, they lack standing to sue.

Under the unique circumstances of the present case, Jackson National should await the outcome of the arbitration brought by the

directly injured parties. I believe that several factors counsel against the maintenance of an independent suit by Jackson National at this time, another of which will be discussed below. Primarily, however, I hearken back to the concern that has always troubled me in this action—the potential for duplicative recoveries. As no less venerable an authority than Justice Holmes has counseled, "The general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 533, 38 S.Ct. 186, 186, 62 L.Ed. 451 (1918). Jackson National has failed to present any justification for taking the perilous "second step" in this case, and the risks of doing so are apparent.

### III. *Jackson National's Damages Are Speculative and Unprovable*

 Closely linked to the problems created by the derivative nature of the plaintiffs' claims are the difficulties created by the speculative character of their damages at this time. Any funds recovered by IPM Products Corporation and IPM Products Company will presumably be available to satisfy Jackson National's claim and will reduce its compensable injury correspondingly. Moreover, none of the notes at issue is due before the year 2002. Plaintiffs have not pleaded that any acceleration has taken place; the extent of their loss at this time is thus even more nebulous.

In *Banker's Trust,* for example, the Court of Appeals examined the RICO claims of a creditor who alleged that it suffered injury as a result of the fraud committed by its debtor's officers in connection with the bankruptcy of the debtor. Although the court did hold that the plaintiff "had standing to bring a RICO claim, regardless of the fact that a bankrupt BAC [the debtor] might also have suffered an identical injury for which it has a similar right of recovery," *Banker's Trust,* 859 F.2d at 1101,[2] the Court of Appeals went on to dismiss "any claim for relief based on

the lost-debt injury." *Id.* at 1106. The court based the dismissal not on the allegedly derivative nature of the plaintiff's claims, but on the fact that "damages in this category are 'unrecoverable,' at least at this time, because 'their accrual is speculative' and 'their amount and nature unprovable.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971)).

In particular, the court noted that any recovery of the fraudulently transferred assets by the bankruptcy trustee would reduce Banker's Trust's injury. Under the circumstances, the Court of Appeals held that:

> [A]t this time, it is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the corporation. Should they be recovered, Bankers would benefit along with BAC's other creditors and its injury would decrease. As a result, the damages in this area are "speculative" and "unprovable". . .; any claim for relief based on the lost-debt injury must therefore be dismissed without prejudice.

*Id.* The same conclusion applies in the present case: it is impossible to determine the award that would make Jackson National whole. If the arbitration proceedings result in an award, IPM Corporation and IPM Company may well be able to satisfy the notes when they fall due in 2002 and 2003. Moreover, Jackson National has brought an action against IPM Corporation and IPM Company in state court, and any amount recovered in that action must be applied to the claimed injury in order to avoid an inequitable windfall to Jackson National. Jackson National itself has alleged only that "plaintiffs' $34 million investment in the securities of IPM Products Corporation has been rendered valueless, or has substantially lost its value, due to the *unlikelihood* of full repayment. Plaintiffs thus have been sub-

---

**2.** The continued vitality of this portion of the *Banker's Trust* opinion in light of the Supreme Court's decision in *Holmes* is questionable. *See, e.g., Paris Partners,* 1995 WL 746585, at *4 n. 3 (noting that the Supreme Court seemed to cast

doubt on the appropriateness of creditor standing under the circumstances presented by *Banker's Trust*); *but see GICC,* 30 F.3d at 293 (citing "the law of RICO standing, as stated in *Banker's Trust*").

stantially damaged in an amount yet to be determined." (Second Amended Complaint, ¶ 81) (emphasis added). A mere "unlikelihood" is simply not sufficient to support an action at this time.

Jackson National's failure to allege provable, nonspeculative damages is particularly crippling in light of the fact that three of its four causes of action require the pleading of actual, present loss. *See, e.g., Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir. 1992) (requiring allegations of damage to plaintiff in order to state a claim under Rule 10b–5); *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1015 (2d Cir. 1989) (same); *see Knudsen v. Quebecor Printing (U.S.A.) Inc.,* 792 F.Supp. 234, 240 (S.D.N.Y.1992) (citing the long-standing rule under New York law that injury is a required element of a claim for common law fraud); *see Eiseman v. State,* 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 614, 511 N.E.2d 1128 (1987) (holding that liability for negligent misrepresentation requires injury or damage to plaintiff). The prematurity of Jackson National's damage claims thus presents another basis for dismissal at this time.

### IV. *Other Infirmities of the Complaint*

■ Based on the remoteness of plaintiffs' injuries, as well as the speculative, unprovable nature of damages at this time, I find that plaintiffs cannot sustain their action. I also note, however, that the complaint is defective in other respects as well. As briefly referenced above, the complaint has failed to allege fraud with the particularity required by Rule 9(b). *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993). In this regard, I particularly note the plaintiffs' failure to distinguish among the "Ligator Defendants" as an egregious example of prohibited "group pleading." *See Paris Partners,* 1995 WL 746585, at *3 ("[The plaintiff] has obfuscated which entities were involved in which transaction by referring to RCA and its subsidiaries collectively as RCA"); *see also Mills,* 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986) (finding that a similar attribution of statements to

"defendants" fell afoul of Rule 9(b)); *Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. De–Con Mechanical Contractors, Inc.,* 896 F.Supp. 342, 346 (S.D.N.Y. 1995) (same). Because I find that the complaint must be dismissed for lack of standing and due to the speculative nature of the plaintiffs' damages, I do not exhaustively catalog the additional shortcomings of the Second Amended Complaint. I note, however, that this dismissal is without prejudice and therefore I commend the plaintiffs to a thorough overhaul of their pleading when and if the time comes to refile it.

### CONCLUSION

Defendants' motion to dismiss is granted, without prejudice.

SO ORDERED.