# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE ANSCHUTZ CORPORATION and LIGHTEDGE HOLDINGS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **C.A. No. 2019-0710-JRS** |
| BROWN ROBIN CAPITAL, LLC, SIERRA TWO INTERNET, INC., LUCAS BRAUN, RYAN ROBINSON, JACK D'ANGELO, BOBBY BOUGHTON and MICHAEL SMERKLO, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: April 8, 2020
Date Decided: June 11, 2020

Michael A. Pittenger, Esquire, Berton W. Ashman, Jr., Esquire, and David M. Hahn, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware; and William M. Regan, Esquire and David R. Michaeli, Esquire of Hogan Lovells US LLP, New York, New York; and Mark C. Hansen, Esquire and John Thorne, Esquire of Kellogg Hansen Todd Figel & Frederick PLLC, Washington, DC, Attorneys for Plaintiffs.

Rudolf Koch, Esquire, Kevin M. Gallagher, Esquire and Ryan D. Konstanzer, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Jack W. Pirozzolo, Esquire and Ben Schwarz, Esquire of Sidley Austin LLP, Boston, Massachusetts; and Christopher M. Egleson, Esquire of Sidley Austin LLP, Los Angeles, California, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

This is a dispute between a vexed buyer and an incredulous seller following the sale of a business. The buyer alleges it is the victim of contractual breaches and fraud; the seller maintains it sold the buyer precisely what was bargained for. In other words, it is a version of a dispute as old and abiding as commerce itself.

In early 2018, Plaintiff, LightEdge Holdings, LLC ("LightEdge" or the "Buyer"), initiated negotiations with Defendants, Brown Robin Capital, LLC ("Brown Robin"), Sierra Two Internet, Inc. ("Sierra"), Lucas Braun ("Braun"), Ryan Robinson ("Robinson"), Jack D'Angelo ("D'Angelo") and Michael Smerklo ("Smerklo") (collectively, the "Sellers"), to acquire OnRamp Access, LLC ("OnRamp" or the "Company"). In the midst of negotiations, LightEdge and its parent company, Plaintiff, the Anschutz Corporation ("Anschutz"), were discouraged when Sellers disclosed that OnRamp had experienced disappointing monthly sales growth and that one of OnRamp's largest customers was significantly scaling back its business. Sellers assuaged these concerns by representing there were no further material customer roll-backs, actual or threatened, and by showcasing a promising pipeline of near-term business opportunities that OnRamp was vigorously pursuing. Satisfied, Buyer closed the transaction on July 2, 2018, with an all-cash purchase price of $106 million (the "Acquisition").

Buyer's satisfaction was short lived. Two months after closing, Yeti Coolers, one of OnRamp's largest customers, reduced its business with OnRamp by nearly

half. Sellers had never disclosed Yeti's multiple requests for major service reductions during the pendency of the negotiations. Adding insult to injury, Buyer then discovered that many of the sales opportunities listed in OnRamp's sales pipeline had either been rejected out-of-hand by the target business well before closing, or were far more speculative than their listed status in the pipeline data suggested.

In the wake of these disconcerting post-closing discoveries, Buyer initiated this action in which it brings claims against Sellers for breach of contract and fraud, along with a slew of other alleged common law and statutory violations. Sellers answer with the common refrain that Buyer's claims amount to nothing more than post-closing buyer's remorse, and maintain that Buyer has failed to well plead any breach of the operative transaction document, the Unit Purchase Agreement (the "UPA"), any fraud, whether in the inducement to contract or otherwise, or any other common law or statutory wrongdoing. They have moved to dismiss all counts of the complaint under Chancery Rule 12(b)(6) for failure to state viable claims.

After carefully considering the complaint and the UPA, I am satisfied that: (1) most of Buyer's breach of contract claims are well-pled and not foreclosed by the unambiguous language of the UPA; (2) Buyer's fraud claims are well-pled and not barred as bootstrapped breach of contract claims; (3) Buyer's claims based on extra-contractual representations are not barred by an unambiguous anti-reliance

2

provision; and (4) Buyer's unjust enrichment claim is not barred as duplicative of its breach of contract claims.  The motion to dismiss those claims is denied.

Buyer has failed to state viable claims, however, for aiding and abetting, civil conspiracy, conversion, Colorado statutory theft and securities fraud and Texas statutory fraud and securities fraud.  The motion to dismiss those claims, therefore, must be granted.

## I.  BACKGROUND

I have drawn the facts from the well-pled allegations in the Verified Complaint[1] and documents incorporated by reference or integral to that pleading.[2] For purposes of this Rule 12(b)(6) motion, I accept those well-pled facts as true.[3]

### A. The Parties

Plaintiff, Anschutz, is a Delaware Corporation with headquarters in Denver, Colorado.[4]  Anschutz owns 96% of LightEdge.[5]

---

[1] Citations to the Verified Complaint are to "Compl. ¶ __."

[2] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a Motion to Dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[3] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[4] Compl. ¶ 14.

[5] Compl. ¶ 15.

Plaintiff, LightEdge, is a Delaware limited liability company with headquarters in Des Moines, Iowa.[6] LightEdge is identified as the Buyer in the UPA.

Defendant, Brown Robin, is a Delaware limited liability company with headquarters in Austin, Texas.[7] Its members reside in Texas, California, Massachusetts and New York.[8] Brown Robin is managed by Braun and Robinson, and it owned 93.2% of OnRamp's equity at closing, making it a Seller.[9]

Defendant, Sierra, is a Texas corporation with headquarters in Austin, Texas.[10] Sierra is owned and controlled by OnRamp's founder, nonparty Chad Kissinger, and is a Seller.[11]

Defendant, Lucas Braun, served as CEO of OnRamp at the time of the Acquisition.[12] He is a Seller and a citizen of Texas.[13]

---

[6] Compl ¶ 15.

[7] Compl. ¶ 16; Defs.' Opening Br. in Supp. of Their Mot. to Dismiss ("OB"), Ex. A (the "UPA") 1.

[8] Compl. ¶ 16.

[9] Compl. ¶¶ 17, 19.

[10] Compl. ¶ 20.

[11] *Id.*

[12] Compl. ¶ 21.

[13] *Id.*

Defendant, Ryan Robinson, served as Chairman and President of OnRamp at the time of the Acquisition.[14] He is a Seller and a citizen of Texas.[15]

Defendant, Jack D'Angelo, served as CFO of OnRamp at the time of the Acquisition.[16] He is a Seller and a citizen of Texas.[17]

Defendant, Mike Smerklo, is a Seller and a citizen of Texas.[18] His role at OnRamp, if any, is not pled in the Complaint.

Defendant, Bobby Boughton, was OnRamp's Vice President of Sales and is a citizen of Texas.[19] Although Boughton is not a Seller, he received a $168,578 bonus when the Acquisition closed and was subsequently promoted to Executive Vice President of Sales at LightEdge.[20]

---

[14] Compl. ¶ 22.

[15] *Id.*

[16] Compl. ¶ 23.

[17] *Id.*

[18] Compl. ¶ 24.

[19] Compl. ¶ 25.

[20] *Id.* I will collectively refer to Braun, Robinson, D'Angelo and Boughton as the "OnRamp Insiders," as they are referred to in the Complaint.

Nonparty, OnRamp, is a provider of IT support and hybrid computing, cloud computing, managed services and data center services.[21]  It operates data centers for its customers' private data and IT infrastructure.[22]

## B. The Disappointing Sales Data

Sellers began to pursue a sale of OnRamp in early 2018, and initiated an auction process.[23]  LightEdge participated in the auction and, after several revised offers, entered into a letter of intent with Sellers on May 18, 2018.[24]  The purchase price was negotiated by referencing multiples of OnRamp's adjusted EBITDA, resulting in a final sale price of $106 million.[25]  Anschutz committed to provide LightEdge with $62 million to finance the Acquisition.[26]

On May 4, 2018, a few weeks before the letter of intent was signed, Sellers disclosed to LightEdge and Anschutz that a significant OnRamp customer, Spiceworks, had cancelled its subscription for services.[27]  This cancellation was

---

[21] Compl. ¶ 28.

[22] *Id.*

[23] Compl. ¶ 29.

[24] *Id.*

[25] Compl. ¶¶ 30–31.

[26] Compl. ¶ 2.

[27] Compl. ¶ 54.

projected to reduce OnRamp's annual recurring revenue by $600,000.[28]  Shortly after disclosing this cancellation, OnRamp provided Anschutz and LightEdge with its April sales data.[29]  That data revealed the Company had generated only $12,000 in new monthly recurring revenue in April, less than a third of its $42,000 target.[30]

## C. The Falsified Salesforce Pipeline Data

The Spiceworks cancellation and disappointing April sales data prompted Buyer to reconsider whether it would continue to pursue the Acquisition.[31]  Before it pulled the plug, however, Buyer wanted a clearer understanding of what opportunities might be awaiting OnRamp down the road.  Accordingly, on May 19, Buyer requested the Company's pipeline data from Salesforce.com ("Salesforce"), an online listing of the Company's sales opportunities, and scheduled a telephone conference with Company management for the next week to discuss the data.[32]  OnRamp's management agreed to the meeting; before providing the requested data, however, under the direction of the OnRamp insiders, Company management

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Compl. ¶ 55.

[32] *Id.*

secretly falsified the pipeline by adding more than $6 million in illusory projected annual revenue.[33]

According to the Complaint, the falsification is revealed upon close examination of the Salesforce databank. For example, before the alleged falsification, the pipeline did not include any active proposal to sell SAP hosting services to Yeti.[34] While the Company had solicited Yeti's business, when it became clear Yeti was not interested, the opportunity was originally designated as "0-Closed Lost" in the Salesforce pipeline, reflecting no potential for a sale.[35] On May 20, the day after LightEdge requested the sales pipeline data, Braun logged into Salesforce and manually changed the Yeti status designation from "0-Closed Lost" to "quoted"—indicating a far more advanced stage in the sales process—even though the Company had never provided Yeti with a quote and Yeti had already demonstrated its lack of interest.[36]

Additionally, Boughton instructed the OnRamp sales team to revise the pipeline to reflect that the Company had "quoted" the American Automobile Association ("AAA") a deal that would bring in $3.6 million in annual recurring

---

[33] Compl. ¶ 57.

[34] Compl. ¶ 58.

[35] *Id.*

[36] Compl. ¶ 59.

8

revenue.[37]  This sale, if closed, would make AAA the Company's largest customer by a considerable margin.[38]  In actuality, the Company's entire relationship with AAA comprised a single meeting, occurring months before the Salesforce entry, during which OnRamp did not identify any specific services it would provide for AAA, much less provide a quote.[39]

### D. The Misleading Interim Financial Statements

In addition to providing false sales pipeline data, Sellers also provided materially misleading financial statements during due diligence.[40]  In this regard, LightEdge alleges certain revenues and accounts receivable listed in OnRamp's interim financial statements—unaudited financials covering the period from the end of Q1 2018 until the signing of the UPA—were known to be uncollectible.[41] For example, revenues and accounts receivable were listed on the interim statements from a customer that had disconnected all services in January 2018.[42]  The interim statements also treated $51,000 owed by a customer as an "account receivable" when

---

[37] Compl. ¶ 64.

[38] *Id.*

[39] *Id.* The Complaint lists other examples of allegedly falsified Salesforce data. Compl. ¶¶ 66–67.

[40] Compl. ¶ 75.

[41] Compl. ¶¶ 76–80.

[42] Compl. ¶ 77.

the customer had only paid $1,000 since September 2017 and was ignoring further collection efforts.[43] Plaintiffs allege these and other misstatements inflated the purchase price paid for OnRamp.[44]

**E. Yeti Substantially Decreases its OnRamp Services**

As of March 31, 2018, in the midst of the most active negotiations leading to the Acquisition, Yeti was Onramp's sixth largest customer, providing the Company with $1,100,280 of annual recurring revenue.[45] As far as LightEdge and Anschutz were concerned, Yeti would continue to be a major source of revenue for the Company after the Acquisition.[46] Unbeknownst to Buyer, however, Yeti had repeatedly communicated to OnRamp its intent to slash its use of the Company's services by nearly half.[47]

Specifically, on December 6, 2017, Yeti notified OnRamp in writing that it planned to "begin reducing some of our costs" and asked OnRamp for "dates to action for a timeline on achieving these [reductions in service.]"[48] On January 22,

---

[43] Compl. ¶ 79.

[44] Compl. ¶ 80.

[45] Compl. ¶ 34. Yeti was the Company's fourth largest customer in 2016 and fifth largest in 2017. *Id.*

[46] Compl. ¶¶ 35–38.

[47] Compl. ¶¶ 38–45.

[48] Compl. ¶ 39.

2018, a Yeti employee called an OnRamp employee to schedule a meeting to discuss planned service reductions, and the next day Yeti informed the Company that it was seeking to reduce its monthly purchases by approximately $42,000 to $48,000.[49] Braun described this meeting to Boughton as "a bit tragic," and Boughton responded by informing Braun that, while there was a small new project for Yeti in the works, a large project involving SAP services "was not even in the kitchen, let alone on the back burner."[50]

Over the following months, Yeti contacted OnRamp numerous times regarding desired service reductions, including an April 23, 2018 email where Yeti outlined requested service cuts amounting to just over $40,000 in monthly recurring revenue.[51] None of these communications were disclosed to Buyer.[52] As it had been previewing it would do for months, Yeti reduced its services by approximately $42,000 per month in September 2018.[53]

---

[49] Compl. ¶ 41.

[50] Compl. ¶ 42.

[51] Compl. ¶¶ 43–45.

[52] Compl. ¶ 48.

[53] Compl. ¶ 46.

## F. The Unit Purchase Agreement

Buyer's acquisition of OnRamp is memorialized in the UPA. As is typical of a document negotiated by sophisticated parties and drafted by experienced counsel, the UPA documents a careful allocation of risk as reflected, in part, within assiduously delineated Seller representations and warranties about the Company.[54] Important for purposes of Buyer's claims are the representations contained in Sections 2.6, 2.10, 2.11 and 2.20.

In Section 2.6, Sellers represent that all of the financial statements provided to LightEdge, including interim financial statements, are accurate and in accordance with Generally Accepted Accounting Principles ("GAAP").[55] They also represent that OnRamp's "books and records . . . reflect only valid transactions and are complete and correct in all material respects."[56]

In Section 2.10, Sellers represent that "the Company has conducted its business in the ordinary course of business consistent with past practices" and that OnRamp has not "terminated or amended in any material respect any Material

---

[54] UPA §§ 2.1–2.23.

[55] UPA § 2.6.

[56] *Id.*

Contract . . . ."[57]  Material Contracts are then identified in the Disclosure Schedules at Section 2.11.

In Section 2.11, Sellers represent that the Disclosure Schedules (at Section 2.11) contain a complete list of Material Contracts to which the Company is bound.[58]  They further represent that, "[o]ther than in the ordinary course of business consistent with past practices, the Company is not participating in any discussions or negotiations regarding any material modification of . . . any Material Contract . . . ."[59]  Section 2.11(f) of the Disclosure Schedules lists Yeti as a Material Contract, and Section 2.11(r) states that OnRamp is "[i]n discussions about a large potential upgrade related to Yeti's migration to a new ERP platform; as part of that there could be additional downgrades along the way, but the upside far outweighs the potential downgrades."[60]  Plaintiffs allege this purported "upgrade" was OnRamp's dead-in-the-water SAP services proposal.[61]

---

[57] UPA § 2.10.

[58] UPA § 2.11.

[59] *Id.*

[60] OB, Ex. B (the "Disclosure Schedules") §§ 2.11(f), (r).

[61] Compl. ¶ 6.

In Section 2.20, Sellers represent that the Disclosure Schedules (at Section 2.20(a)) list the Company's twenty largest customers.[62] They further represent that, "[o]ther than as set forth on Section[] 2.20(a) [] of the Disclosure Schedule, none of the customers listed on Section 2.20(a) of the Disclosure Schedule . . . [has] to the Company's Knowledge, threatened in writing to cancel, terminate, adversely modify or decrease [] in any material respect, its commercial relationship with the Company."[63] Section 2.20(a) of the Disclosure Schedules identifies Yeti as one of the Company's largest customers.[64] It further lists Yeti as downgrading its service by $4,665 per month, far less than the $40,000+ per month reduction Yeti had specifically demanded.[65]

In Section 7.2, Sellers commit to indemnify Buyer for any breach of a representation or warranty.[66] Section 7.5(a), however, limits Sellers' indemnification obligations for any breach to a maximum of $7.5 million.[67] While

---

[62] UPA § 2.20.

[63] *Id.*

[64] Disclosure Schedules § 2.20.

[65] *Id.*; Compl. ¶ 44.

[66] UPA § 7.2.

[67] UPA § 7.5(a).

indemnification is listed as the sole remedy for breaches of the UPA, there is an exception for claims of fraud.[68] There is no cap on recovery for fraud.[69]

The UPA contains a Delaware choice of law provision and an exclusive Delaware forum selection provision.[70] In a related case, I held that the UPA's forum selection provision requires Plaintiffs to litigate all of their claims in this court.[71]

## G. Procedural History

Plaintiffs originally filed suit in the United States District Court for the Western District of Texas.[72] They voluntarily dismissed that case and refiled in Texas state court.[73] On June 14, 2019, Defendants filed suit in this court to enforce the UPA's Delaware forum selection provision and enjoin Plaintiffs from prosecuting their claims in Texas. After this Court entered a preliminary antisuit injunction, Plaintiffs filed their Complaint in this court on September 5, 2019.[74]

---

[68] UPA § 7.13.

[69] UPA § 7.5(b).

[70] UPA § 13.8.

[71] *Brown Robin Capital v. The Anschutz Corp.*, C.A. No. 2019-0456-JRS (Del. Ch. Aug. 14, 2019) (TRANSCRIPT) (D.I. 41).

[72] *See* Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("AB"), Ex. A.

[73] *See* AB, Ex. B.

[74] *Brown Robin*, C.A. No. 2019-0456-JRS, at *59; D.I. 1.

15

Plaintiffs' Complaint comprises thirteen counts, each arising from alleged misrepresentations concerning Yeti, the Salesforce pipeline or the interim financial statements.[75] Count I claims Sellers breached the UPA because representations included in Sections 2.6, 2.10, 2.11 and 2.20 are false, and Sellers have failed to indemnify Buyers for these breaches; Count II alleges a fraudulent and intentional breach of contract;[76] Count III alleges the OnRamp Insiders committed common law fraud; Count IV alleges the OnRamp Insiders conspired to commit fraud; Count V alleges the OnRamp Insiders aided and abetted each other's fraud; Count VI alleges the OnRamp Insiders fraudulently induced Plaintiffs to acquire OnRamp; Count VII pleads constructive fraud, although Plaintiffs have withdrawn this claim;[77] Count VIII pleads unjust enrichment against all Defendants; Count IX pleads conversion against the OnRamp Insiders; Count X alleges the OnRamp Insiders violated Colorado's civil theft statute; Count XI alleges the OnRamp Insiders violated the Colorado Securities Act; Count XII alleges the OnRamp Insiders violated the Texas

---

[75] Compl. ¶¶ 81–168.

[76] Plaintiffs did not oppose Defendants' Motion to Dismiss their "intentional [or fraudulent] breach" claim in their answering brief or at oral argument. Accordingly, that claim must be dismissed. *Seagraves v. Urstadt Prop. Co.*, 1996 WL 159626, at *5 (Del. Ch. Apr. 1, 1996) (finding that plaintiff's failure to oppose the defendant's motion to dismiss certain claims "merits dismissal" of those claims).

[77] AB 45 n.6.

Securities Act; and Count XIII alleges the OnRamp Insiders violated the Texas civil fraud statute.[78]

Defendants have moved to dismiss each of Plaintiffs' claims under Chancery Rule 12(b)(6). In support of the Motion, they argue: (1) claims asserted by Anschutz must be dismissed because Anschutz lacks standing;[79] (2) the Colorado and Texas statutory claims must be dismissed because Delaware law applies to all of Plaintiffs' claims;[80] (3) the breach of contract claims must be dismissed because the documents integral to the Complaint reveal that each of the representations included in Section 2 of the UPA were true at closing, and everything required to be disclosed was included in the Disclosure Schedules;[81] (4) the fraud claims must be dismissed because they are impermissibly bootstrapped to contract claims, they are barred by the UPA's anti-reliance provisions and they are not pled with the particularity required by Court of Chancery Rule 9(b);[82] (5) the conspiracy and aiding and abetting claims must be dismissed because the underlying fraud claims fail or, in the

---

[78] Compl. ¶¶ 81–168. The Texas statutory claims are pled in the alternative to the Colorado claims in the event this Court concludes Texas law, not Colorado or Delaware law, applies. Compl. ¶¶ 153, 161.

[79] OB 12–14.

[80] OB 14, 43.

[81] OB 18–25.

[82] OB 26–36.

17

alternative, because agents of a single business entity cannot conspire with each other or aid and abet other agents in the commission of a tort;[83] (6) the unjust enrichment claim must be dismissed as duplicative of the breach of contract claims;[84] and (7) the conversion claim must be dismissed because Delaware law is clear that money cannot be the object of a conversion claim.[85]

## II. ANALYSIS

The legal standards governing a motion to dismiss for failure to state a claim are well-settled. This court will dismiss a complaint under Rule 12(b)(6) if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on facts pled in the complaint.[86] When applying this standard, "[a]ll well-pleaded factual allegations are accepted as true[,]" and "the Court must draw all reasonable inferences in favor of the non-moving party. . . ."[87]

---

[83] OB 40–41.

[84] OB 42.

[85] OB 42–43.

[86] *Gen. Motors*, 897 A.2d at 168 (internal quotations omitted).

[87] *Savor, Inc. v. FMR Corp.*, 812 A.2d, 894, 896–97 (Del. 2002) (internal citations omitted).

## A. Anschutz Lacks Standing

Defendants begin their multi-pronged attack on the Complaint by arguing that Anschutz must be dismissed as a plaintiff because, having suffered no direct injury, it lacks standing.[88] They claim LightEdge, as the sole buyer of OnRamp, is the only party that has conceivably suffered a direct injury. Accordingly, if Anschutz wishes to recover its losses, it must look to LightEdge for redress.[89] Plaintiffs respond that Anschutz wired LightEdge $62 million to finance the purchase, meaning it has suffered "a direct injury which [has] result[ed] in actual damages."[90]

"Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."[91] "To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[92]

---

[88] OB 13.

[89] *Id.*

[90] AB 52 (quoting *Barkauski v. Indian River Sch. Dist.*, 951 F. Supp. 519, 542 (D. Del. 1996).

[91] *Dover Historical Soc. v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[92] *Id.*

19

The United States District Court for the Southern District of New York confronted an analogous standing issue in *Jackson National Life Insurance Co. v. Ligator*.[93] There, an investor had provided financing for an intermediary's acquisition of companies controlled by the seller defendants.[94] After closing, both the investor and the buyer sued, claiming the sellers' misrepresentations propped up an artificially inflated purchase price.[95] As is the case here, both the investor and the buyer's claims rested on "the same legal theories."[96] Agreeing with the sellers that the investor lacked standing to sue, the court held that only the buyer was directly injured by the sellers' alleged misconduct, and that the investor had suffered no injury distinct from the injury suffered by the buyer.[97]

I endorse *Ligator*'s analysis and apply it here. Anschutz's only claimed injury is that it helped fund LightEdge's purchase of a company whose value was

---

[93] 949 F. Supp. 200 (S.D.N.Y. 1996). While *Ligator* is a federal case applying federal standing law, "[t]his Court has recognized that the [] requirements for establishing standing under Article III to bring an action in federal court are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware." *Dover Historical Soc.*, 838 A.2d at 1110.

[94] *Ligator*, 949 F. Supp. at 201.

[95] *Id.* at 203.

[96] *Id.*

[97] *Id.* at 205.

artificially inflated as a result of Sellers' misrepresentations.[98] Plaintiffs cannot dispute that LightEdge, not Anschutz, actually acquired OnRamp. Anschutz thus finds itself positioned identically with the investor in *Ligator*; it has suffered no injury distinct from the Buyer's, and therefore lacks standing.[99] As an indirectly injured party, Anschutz must pursue its share of any recovery LightEdge might achieve directly from its subsidiary.[100]

## B. Delaware Law Governs Plaintiffs' Claims

As noted, Buyer has asserted claims for fraud and securities violations based on Texas and Colorado statutes. The OnRamp Insiders move to dismiss those claims on the ground that Delaware law applies to all aspects of the parties' dispute.[101] In support of this position, they point to the Delaware choice of law provision in the UPA and this Court's August 2019 Transcript Ruling holding that the UPA's similarly phrased Delaware forum selection provision applied to all of Plaintiffs' claims, including their extra-contractual claims.[102] Buyer responds that, by its terms,

---

[98] Compl. ¶ 2.

[99] *Ligator*, 949 F. Supp. at 204.

[100] Having found Anschutz lacks standing, the rest of this Opinion will only refer to "Buyer's" claims.

[101] OB 14, 43.

[102] *See* OB 14–15; *Brown Robin Capital, LLC v. The Anschutz Corp.*, C.A. No. 2019-0456-JRS, D.I. 41, Transcript at 62.

the choice of law provision applies only to the construction and interpretation of the UPA, and therefore its other common law and statutory claims are not subject to the provision.[103]

Delaware respects and generally enforces contracting parties' selection of a particular state's law to govern their disputes.[104] In line with this policy, the Delaware General Assembly passed 6 *Del. C.* § 2708, which requires courts to presume that, where parties have chosen Delaware law in their contract, the transaction memorialized in the contract has a material relationship with our state.[105]

The question, then, is whether a choice of law provision governing construction and interpretation of the UPA also applies to Buyer's extra-contractual claims. Then Vice Chancellor Strine confronted this very question when construing a nearly identical choice of law provision in his seminal *Abry Partners* decision.[106]

---

[103] AB 49–51.

[104] *See J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction.").

[105] 6 *Del. C.* § 2708(a). The $100,000 monetary floor required for the law to apply is easily cleared here. Compl. ¶ 2.

[106] *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1046 (Del. Ch. 2006). The provision in *Abry* stated, "[t]his Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law." *Id.* The provision at issue here states, "[t]his Agreement, and the Transaction Documents shall be exclusively construed and interpreted according to the Laws of the State of Delaware, without regard

22

In holding the contract's choice of law provision governed the *Abry* plaintiff's extra-contractual claims, including fraud, he wrote:

> Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid. In this regard, it is also notable that the relationship between contract and tort law regarding the avoidance of contracts on grounds of misrepresentation is an exceedingly complex and unwieldy one, even within the law of single jurisdictions. To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote.[107]

This logic is persuasive and I apply it here. Like *Abry*, the fraud claims in this case are entangled at a granular level with the operative contract's allocation of risk.[108] The conduct giving rise to the breach of contract claims is, with one potential exception,[109] identical to the conduct giving rise to the fraud claims.[110] Additionally, unlike *Abry*, this case involves a separate disagreement between the parties about

---

to its conflict of law provisions which would require the application of the Laws of a state other than Delaware . . . ." Agreement § 13.8  As stated, the provisions are nearly identical.

[107] *Abry*, 891 A.2d at 1048.

[108] *Id.* at 1048–49.

[109] I will address Buyer's sole basis to claim fraudulent inducement later in this Opinion.

[110] Compl. ¶¶ 6–13.

whether the UPA contains unambiguous anti-reliance language that would bar extra-contractual fraud claims.[111]  To try to parse out what exactly should be decided under Delaware law and what falls under another state's law (e.g., Texas, Colorado or some combination of both) would be a foolhardy endeavor almost certain to result in the kind of confusion contractual choice of law provisions are meant to avoid.[112]

Buyer has pointed to two cases it claims cast doubt on *Abry*'s holding.[113] In the first, the United States District Court for the District of Delaware found that a narrow choice of law provision incorporated by reference into a bond instrument did not apply to an action challenging the defendants' alleged bad faith conduct.[114]

---

[111] *Abry*, 891 A.2d at 1035 (noting the plaintiff did not contest that there was an anti-reliance clause).  *Infra* II.D.1.

[112] *Abry*, 891 A.2d at 1048.

[113] Buyer has not pointed to any decision of our Supreme Court questioning the holding in *Abry*.  And *Abry*'s approach has been endorsed consistently by this court and our sister court. *See, e.g.*, *Transdigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *5 (Del. Ch. May 29, 2013) ("Nevertheless, the Court in *Abry* concluded that the Restatement (Second) Section 201 provides the appropriate framework for determining the law applicable to claims for fraud in the inducement and fraudulent misrepresentation.  Under this framework, the Court found that it should apply the law the parties chose to govern contractual rights and duties 'unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest.'  I agree.  Therefore, I conclude that Delaware law governs the issues raised by Counts II–V of Alcoa's Counterclaim."); *Standard Gen., LP v. Charney*, 2017 WL 6498063, at *9 (Del. Ch. Dec. 19, 2017) (quoting *Abry*'s choice of law analysis with approval); *Change Capital P'rs Fund I, LLC v. Volt Elec. Sys., LLC*, 2018 WL 1635006, at *9 (Del. Super. Ct. Apr. 3, 2018) (same).

[114] *VSI Sales, LLC v. Int'l Fidelity Ins. Co.*, 2015 WL 5568623, at *1–3 (D. Del. Sept. 22, 2015).

It then applied the "most significant relationship" test to determine choice of law.[115] The district court acknowledged in a footnote that *Abry* applied a different analysis, but nowhere did the court cast doubt on *Abry*'s holding; the court simply came to a different result on a different factual record.[116] Buyer's second case involved a

*Remainder of Page Intentionally Left Blank*

---

[115] *Id.* at *4.

[116] *Id.* at *3 n.5.

Delaware court applying English law in its choice of law analysis and is obviously distinguishable.[117] As Delaware law applies to all of Buyer's claims, Counts X–XII, the Texas and Colorado statutory claims, must be dismissed.[118]

---

[117] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 766 (Del. Ch. 2014). Additionally, even assuming the choice of law provision in the contract would not apply to the tort claims, Delaware law would still likely govern those claims. Delaware follows the Restatement (Second) of Conflict of Laws when analyzing choice of law for tort claims. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46–47 (Del. 1991). At bottom, the Restatement paradigm asks which state has "the most significant relationship" to the underlying conduct giving rise to the claim. RESTATEMENT (SECOND) CONFLICT OF LAWS § 145 (2019). When engaged in this inquiry, this court considers four factors: (1) the place of injury; (2) the place where the conduct causing the injury occurred; (3) the domicile or place of incorporation and place of business of the parties; and (4) the place where the relationship of the parties is centered. *Travelers*, 594 A.2d at 47. Anschutz, LightEdge and Brown Robin all have chosen to domicile in Delaware. Compl. ¶¶ 15–16; UPA 1. The individual parties in this case are domiciled in Texas, and the business organizations have their headquarters in Texas, Colorado and Iowa. Compl. ¶¶ 14–25. The alleged injury here occurred in both Texas and Colorado. *See* Compl. ¶ 2. The conduct causing the injury occurred in Texas. Compl. ¶¶ 1, 20–25. The relationship among the parties is grounded by contract in Delaware, and by conduct in Texas, Colorado and Iowa. UPA § 13.8; Compl. ¶¶ 14–25. Given that both Plaintiff entities and Brown Robin are Delaware entities and the parties chose Delaware law to govern construction of the UPA, which necessarily interacts with the tort claims, and no other state has a straightforward claim to the most significant relationship to the dispute, it seems likely Delaware has the most significant relationship to the tort claims even if the choice of law provision would not directly reach them.

[118] *See Vichi*, 85 A.3d at 772 (finding that where English law did not apply, a party could not invoke an English statute).

## C. Breach of Contract

A plaintiff pleading breach of contract must allege: (1) the existence of a contract; (2) the breach of a contractual obligation; and (3) resulting damages.[119] Sellers do not dispute that the first element (the existence of a binding contract) has been well-pled, and only challenge the third element (resulting damages) with respect to the breach claim relating to the allegedly falsified pipeline data.[120] The primary issue, then, concerns the second element—whether Sellers breached the UPA.

This court may address issues surrounding "the proper interpretation of language in a contract" on a motion to dismiss only "[w]hen the language of [the] contract is plain and unambiguous . . . ."[121] Contract language is ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[122] Dismissal of a plaintiff's breach of contract claim, therefore, is appropriate only when a defendant has offered the singular reasonable construction of the operative language as a matter

---

[119] *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *2 (Del. Ch. Feb. 16, 2011).

[120] OB 23.

[121] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[122] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) (quotations omitted).

of law, and that construction reveals there has been no breach.[123] If the plaintiff has proffered a reasonable construction that supports its allegation of breach, dismissal must be denied.[124]

The Complaint alleges three separate breaches of the UPA by Sellers: (1) the failure to disclose Yeti's planned service downgrades in violation of Sections 2.10, 2.11 and 2.20;[125] (2) the manipulation of Salesforce pipeline data in violation of Sections 2.6 and 2.10;[126] and (3) the disclosure of false interim financial statements in violation of Section 2.6.[127] I address each alleged breach in turn.

### 1. The Yeti Service Downgrades

Section 2.11 of the UPA represents that, "[o]ther than in the ordinary course of business consistent with past practices, the Company is not participating in any discussions or negotiations regarding any material modification of, or any material amendment to, any Material Contract . . . ."[128] Section 2.11 of the Disclosure

---

[123] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014).

[124] *Id.*

[125] Compl. ¶¶ 34–51.

[126] Compl. ¶¶ 52–74.

[127] Compl. ¶¶ 75–80.

[128] UPA § 2.11(r).

Schedules lists the Yeti service agreement as a Material Contract.[129] That Section further discloses that the Company is "[i]n discussions about a large potential upgrade related to Yeti's migration to a new ERP platform; as part of that there could be additional downgrades along the way, but the upside far outweighs the potential downgrades."[130]

Neither party contends Section 2.11 is ambiguous, and for good reason. The provision is clear on its face. Instead, Sellers seek dismissal of this breach claim because it is clear from the Complaint, and properly incorporated documents, that Sellers did not falsely disclose the state of Yeti's relationship with the Company as Sellers believed, in good faith, that a potential SAP services upgrade for Yeti would more than offset Yeti's proposed cuts.[131] Thus, Sellers argue, Buyer has not pled a reasonably conceivable breach of contract.

I disagree. Yeti is alleged to have requested significant reductions in its usage of OnRamp's services on multiple occasions, including an April 23, 2018 email specifically detailing in excess of $40,000 in demanded monthly recurring revenue cuts.[132] Buyer has well pled that this undisclosed request falls within Section 2.11's

---

[129] Disclosure Schedules § 2.11(f).

[130] Disclosure Schedules § 2.11(r).

[131] OB 19–20.

[132] Compl. ¶ 44.

requirement that Sellers disclose "discussions or negotiations regarding any material modification of" a Material Contract.[133]  Sellers may ultimately be able to prove these cuts were reasonably anticipated to have been offset by the SAP upgrade, and that the Disclosure Schedules were, therefore, accurate.  But that is not what Buyer has pled.  Instead, the Complaint alleges the potential SAP upgrade was, at best, speculative, while the proposed cuts were actually demanded (in writing) and imminently forthcoming.[134]  That is sufficient to plead a reasonably conceivable breach of the UPA.

Additionally, Buyer has pled that Yeti's demanded downgrade had no connection to any proposed SAP upgrade.[135]  Yet the UPA's Disclosure Schedules state, "as part of that [upgrade] there could be additional downgrades . . . ."[136]  This statement suggests that any proposed cuts will be linked directly to a potential upgrade.  Even if Sellers could argue at this pleading stage that Schedule 2.11(r) put Buyer on notice that Yeti was planning significant cuts, a dubious proposition in the context of the Complaint's well-pled facts, the Seller's overt attempt explicitly to link these cuts to a potential upgrade they knew "was not even in the kitchen, let

---

[133] UPA § 2.11(r).

[134] Compl. ¶¶ 42, 47, 58–59.

[135] Compl. ¶ 46.

[136] Disclosure Schedules § 2.11(r).

alone on the back burner[,]" is conceivably in conflict with the representation in Section 2.11.[137] As Buyer has adequately pled that the disclosures in Schedule 2.11(r) are false, it follows that it has well-pled the representation in Section 2.11 is also false.

Turning to Section 2.20, Sellers represent there that, except as disclosed in Section 2.20(a) of the Disclosure Schedules, none of OnRamp's twenty largest customers has "threatened in writing to cancel, terminate, adversely modify or decrease, in each case, in any material respect, its commercial relationship with the Company."[138] Section 2.20 of the Disclosure Schedules lists Yeti as reducing its monthly recurring revenue by $4,665, but makes no mention of the roughly $40,000 in monthly cuts Yeti had already threatened.[139]

Again, the parties have not argued this provision is ambiguous, and again, the concession is well placed. The clear language of Section 2.20 would require Sellers to disclose that Yeti was threatening (in writing) substantial service reductions.[140] Yeti is alleged to have notified the OnRamp Insiders on multiple occasions, in writing, that it was intent on implementing major cost cuts, including making a

---

[137] Compl. ¶ 42.

[138] UPA § 2.20.

[139] Disclosure Schedules § 2.20(a).

[140] UPA § 2.20.

31

detailed written request for approximately $40,000 in monthly recurring revenue cuts.[141] These pled facts easily satisfy Buyer's burden of stating a reasonably conceivable breach of contract claim with respect to Section 2.20.[142]

Buyer alleges the failure to disclose the anticipated Yeti cuts also breached Section 2.10. Here, in my view, Buyer's pleading falls short. As an initial matter, Section 2.10 requires disclosure only when a customer has "terminated or amended in any material respect any Material Contract . . . ."[143] As of closing, Yeti had not yet amended its contract with OnRamp to implement its desired cost cuts; that amendment did not occur until September 2018, months after the Acquisition closed.[144]

In an effort to plead around this reality, Buyer focuses on the language in Section 2.10 requiring OnRamp to operate "in the ordinary course of business consistent with past practices."[145] Buyer alleges this covenant was breached because Sellers resisted implementing Yeti's desired downgrades, presumably to avoid

---

[141] Compl. ¶¶ 39, 43–45.

[142] Perhaps recognizing the strength of Buyer's arguments, Sellers only passingly addressed Section 2.20 in their briefs.

[143] UPA § 2.10(l).

[144] Compl. ¶ 46.

[145] UPA § 2.10.

having to disclose them.[146] The Complaint does not plead, however, that fighting to keep a customer was somehow out of OnRamp's ordinary course of business. Buyer has failed to plead, therefore, that Sellers failing to disclose Yeti's planned service downgrades conceivably breached Section 2.10's "ordinary course" covenant.

### 2. The Salesforce Pipeline Data

Buyer alleges Sellers breached Sections 2.6 and 2.10 of the UPA by falsifying the Company's Salesforce pipeline data.[147] Specifically, it says the representations in Sections 2.6 and 2.10 were rendered false when Sellers knowingly inserted fanciful sales data into the pipeline in response to Buyer's inquiries about future sales prospects.[148] Sellers vigorously deny Buyer's factual allegations, but argue, even accepting those allegations as true, that no representation in the UPA was breached because the Salesforce pipeline data is not covered by any representation in the UPA.[149]

In Section 2.6, Sellers represent that OnRamp's financial statements are accurate and "[t]he books and records of the Company have been maintained in accordance with good business practices, reflect only valid transactions and are

---

[146] AB 29–30.

[147] Compl. ¶¶ 52–74.

[148] AB 30–32.

[149] OB 20–23.

complete and correct in all material respects."[150]  The parties disagree on the meaning and scope of Section 2.6.  Buyer argues the Salesforce pipeline is captured by the "books and records" language in the representation.[151]  Sellers respond that the context in which this language appears in the UPA indicates it refers only to "financial books and records," and that Buyer's construction is overly broad.[152]

Both parties have offered reasonable constructions of Section 2.6.  Buyer is correct that the provision clearly states "books and records," not "financial books and records," and thus is broader than the construction Sellers have proffered.[153]  Sellers were free, after all, to bargain for a narrower provision.[154]  If Salesforce pipeline data is covered by the phrase "books and records," then it is reasonably conceivable that knowingly inserting falsified data in the pipeline data disclosed to Buyer would render the representation in Section 2.6 false.

Sellers convincingly note, however, that Section 2.6 also represents that the books and records "reflect only valid transactions[,]" suggesting that the Salesforce

---

[150] UPA § 2.6(a).

[151] AB 31–32.

[152] Oral Arg. on Defs.' Mot. to Dismiss ("OA") 13.

[153] UPA § 2.6(a).

[154] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (holding that Delaware courts may not "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.").

data, which reflects only "prospective transactions," falls outside of the representation.[155] Because both sides have offered reasonable constructions of Section 2.6, the provision is ambiguous, and Defendants' Motion to Dismiss must be denied.[156]

Buyer next alleges that Section 2.10's representation that the Company had conducted its business in the ordinary course during the Acquisition negotiations is false in light of the alleged pipeline manipulation.[157] The parties also dispute the scope of this representation. "This Court has previously interpreted the contractual term 'ordinary course' to mean the normal and ordinary routine of conducting business."[158] These representations are common in transaction agreements and are included to reassure a buyer that the target company has not materially changed its business or business practices during the pendency of the transaction.[159]

---

[155] OA 15.

[156] *Caspian*, 93 A.3d 1205. *See also Calesa Assocs., LP v. Am. Capital, Ltd.*, 2018 WL 4026976, at *1 (Del. Ch. Aug. 22, 2018) (noting that the court is not to choose which of two reasonable constructions is more reasonable before considering extrinsic evidence).

[157] AB 30.

[158] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *13 (Del. Ch. Oct. 31, 2014) (quotation omitted).

[159] *See Akorn, Inc. v. Fresenius Kabi AG.*, 2018 WL 4719347, at *83 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (TABLE).

Vice Chancellor Laster offered a thoughtful exegesis of the typical "ordinary course covenant" in *Akorn, Inc. v. Fresenius Kabi AG*.[160]  There, he found (after trial) that a target company violated the covenant post-signing by fabricating clinical trial data that was reported to the FDA, cancelling its regular audits and failing to investigate credible whistleblower allegations.[161]  Other decisions of this court are in accord, finding that ordinary course representations either were actually violated or were well-pled to have been violated when: seller's employees manipulated financial records in deviation from its past accounting practices; a company substantially restructured its business; and employees of a company schemed to start a competing business and redirected assets to that competing business during the pendency of a transaction.[162]

It is reasonably conceivable that manipulating pipeline data in May, 2018, as a means to quiet the concerns of an anxious buyer, is not conduct undertaken "in the ordinary course of business consistent with past practices."[163]  Sellers, therefore,

---

[160] *Id.* at *83–93.  While *Akorn* involved an ordinary course covenant, and this case involves an ordinary course representation, the distinction does not impact my analysis.

[161] *Id.* at *88–89.

[162] *See ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *8 (Del. Ch. July 31, 2018); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *7 (Del. Ch. Nov. 19, 2013); *Ivize of Milwaukee, LLC v. Complex Litig. Supp., LLC*, 2009 WL 1111179, at *1 (Del. Ch. Apr. 7, 2009).

[163] Compl. ¶ 57; UPA § 2.10.

conceivably breached Section 2.10's representation that no such deviations from the "ordinary course of business" had occurred since December 31, 2017.

Sellers' final attempt to defeat the Salesforce pipeline data breach claim rests on Buyer's purported failure to plead damages causally linked to the breach.[164] In this regard, they note Buyer initially offered $106 million for the Company on May 18, 2018, before the allegedly fabricated sales pipeline data was transmitted.[165] As Buyer calculated the purchase price before viewing the misleading pipeline data, Sellers argue Buyer cannot plead or prove causal damages.[166]

Sellers overstate Buyer's burden. To survive a dispositive motion on a breach of contract claim, it is enough that a plaintiff "takes the causation of damages out of the area of speculation; it is not necessary to show with absolute certainty that defendant's action caused plaintiff's harm."[167] Buyer pleads that the Spiceworks cancellation and disappointing April sales data caused it to reconsider the Acquisition.[168] It alleges that the millions of dollars in annual sales opportunities

---

[164] OB 23.

[165] *Id.*

[166] *Id.*

[167] *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *7 (Del. Ch. May 1, 2007) (*aff'd*, 956 A.2d 642 (Del. 2008) (TABLE)).

[168] Compl. ¶¶ 55–57.

added to the Salesforce pipeline were key to inducing it to move forward at the previously agreed upon price and eventually close.[169] This is more than sufficient to "take[] the causation damages out of the area of speculation," and meet Buyer's notice pleading burden at the Rule 12(b)(6) stage.[170]

### 3. The Interim Financial Statements

Buyer alleges Sellers breached Section 2.6 of the UPA by including revenue and accounts receivable in the interim financial statements that they knew were uncollectible.[171] Section 2.6 represents that, "[t]he Audited Financial Statements and the Interim Financial Statements present fairly and accurately, in all material respects, the financial position of the Company . . . in accordance with GAAP . . . ."[172]

Buyer identifies numerous allegedly misleading entries in the interim financial statements.[173] In particular, it argues the interim statements included revenue and account receivables from Pure Healthy Back, Inc., Keona Health, Inc. and XOR Data Exchange LLC, even though those customers had either disconnected

---

[169] *Id.*

[170] *LaPoint*, 2007 WL 1309398, at *7.

[171] Compl. ¶ 76.

[172] UPA § 2.6.

[173] Compl. ¶¶ 76–79.

all OnRamp services months earlier, were shutting down operations or were otherwise unwilling or unable to settle their accounts.[174] Sellers respond that Buyer has not well-pled a breach of Section 2.6 because it did not identify which GAAP standard was breached in the Complaint, and Sellers did not otherwise warrant all accounts receivable would, in fact, be collected.[175]

The notion that Buyer was required to plead exactly which GAAP standard was violated by Sellers in order to state a breach of contract claim based on a representation that interim financial statements were prepared in accordance with GAAP finds no support in our case law and runs contrary to notice pleading as codified in Chancery Rule 8(a). That rule requires only a short statement putting Defendants on notice of the claims against them.[176] As the Complaint alleged the interim financial statements did not comply with GAAP, in violation of Section 2.6 of the UPA, Sellers have been put on fair notice of the claim against them. For now,

---

[174] Compl. ¶¶ 78–79.

[175] OB 24–25.

[176] Ct. Ch. R. 8(a); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) ("Such a statement must only give the defendant fair notice of a claim and is to be liberally construed."); *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979) ("A complaint in a civil action need only give defendant fair notice of a claim and is to be liberally construed.").

that is all that is required.[177]  If GAAP does not support the claim, Buyer will fail in its burden to prove it.

## D. Fraud and Fraudulent Inducement

Buyer's fraud claims take two forms.  First, it alleges the same course of conduct underlying its breach of contract claims also gives rise to actionable fraud claims.[178]  Separately, it alleges the OnRamp Insiders made extra-contractual misrepresentations that fraudulently induced it to sign the UPA and acquire OnRamp.[179]

The OnRamp Insiders argue the fraud claims should be dismissed for three reasons.  First, they argue that any fraud claims premised on extra-contractual representations are precluded by the UPA's anti-reliance language.[180]  Next, they maintain the fraud claims based on contractual misrepresentations are impermissibly bootstrapped breach of contract claims.[181]  Last, they argue the elements of fraud

---

[177] Compl. ¶¶ 75–80.

[178] Compl. ¶¶ 94–99.

[179] Compl. ¶¶ 110–115.

[180] OB 29–30.

[181] OB 26–28.

have not pled with the particularity required by Court of Chancery Rule 9(b).[182]

I take up the arguments in that order.

### 1. The Extra-Contractual Misrepresentations

According to the Complaint, Buyer was fraudulently induced to agree to the Acquisition by the OnRamp Insiders' extra-contractual representations about the Company.[183] Here, the Complaint focuses on the disclosure of the falsified Salesforce data to Buyer as the means by which the OnRamp Insiders brought Buyer back to the negotiating table and ultimately induced it to sign the UPA.[184]

Consistent with our state's policy of promoting the freedom of contract, Delaware courts have consistently held that "sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract."[185] With this in

---

[182] OB 30–36.

[183] Compl. ¶ 111.

[184] Compl. ¶¶ 111–14. This would only be an extra-contractual representation if this Court finds, when adjudicating Buyer's breach of contract claims, that the UPA does not contain a representation relating to the Salesforce data. If, upon offering a definitive construction of the contract, this Court finds that either Section 2.06 or Section 2.10 capture the Salesforce data, then there would be no extra-contractual representation upon which to ground a fraudulent inducement claim.

[185] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003); *see also RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012) ("*Abry Partners* accurately states Delaware law and explains Delaware's public policy in favor of enforcing contractually binding written disclaimers of reliance on representations outside of a final agreement of sale or merger."); *ev3, Inc. v. Lesh*, 114 A.3d 527, 529 n.3

mind, this court does not hesitate to dismiss fraud claims premised on extra-contractual representations when the parties' contract contains an unambiguous mutual covenant that neither party relied upon extra-contractual promises in connection with the transaction.[186]  But the anti-reliance language must be explicit and comprehensive, meaning the parties must "forthrightly affirm that they are not relying upon any representation or statement of fact not contained [in the contract]."[187]  A standard integration clause, without more, is insufficient to disclaim all reliance on extra-contractual statements.[188]

The OnRamp Insiders point to three provisions they claim, in total, amount to unambiguous anti-reliance language.  First, Section 2.23 of the UPA states, "[e]xcept for the representations and warranties contained in this Article II . . . none of the Company nor any Person on behalf of the Company makes any other express or

---

(Del. 2014) ("Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce.").

[186] *Abry*, 891 A.2d at 1057; *Kronenberg v. Katz*, 872 A.2d 568, 588 (Del. Ch. 2004).  This language may be spread over multiple provisions if, in total, it can be read to disclaim reliance. *See Prairie Capital III, L.P. v. Double E. Hldg. Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015) ("Delaware law does not require magic words. In this case, the Exclusive Representations Clause and the Integration Clause combine to mean that the Buyer did not rely on other information. They add up to a clear anti-reliance clause.").

[187] *Kronenberg*, 872 A.2d at 591; *see Abry*, 891 A.2d at 1059 ("[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations.").

[188] *Id.*

implied representation or warranty with respect to the Company, and the Company disclaims any other representations or warranties . . . ."[189] Second, in Section 4.7, "Buyer acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning, the Company and its business and operations, and that it has been provided with such information about the Company and its business and operations as it has requested."[190] Last, the UPA contains a standard integration clause.[191]

What is notably absent from these provisions is any disclaimer of reliance by Buyer. In *Heritage Handoff Holdings, LLC v. Fontanella*,[192] the court found contractual language did not constitute unambiguous anti-reliance language, in large part, because the "[p]laintiff did not affirmatively promise not to rely on such [extra-contractual] representations."[193] While our law does not require "magic words" to disclaim reliance, when the contract does not actually include a specific acknowledgement by a party that it is only relying on information contained within

[189] UPA § 2.23.

[190] UPA § 4.7.

[191] *See* UPA § 13.4 ("This agreement . . . embod[ies] the entire agreement and understanding of the Parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous discussions, agreements and understandings relative to such subject matter . . . .").

[192] 2019 WL 1056270 (D. Del. Mar. 6, 2019).

[193] *Id.* at *4.

the four corners of the agreement, that party is not shirking its bargain when it later alleges that it did, in fact, rely on extra-contractual representations.[194]

The cases the OnRamp Insiders rely on to support their argument that the language in the UPA amounts to an unambiguous anti-reliance provision are distinguishable. In *Prairie Capital*, the buyer represented that it "understands, acknowledges, and agrees" that the seller was disclaiming extra-contractual representations.[195] In *Sparton Corp. v. O'Neil*, the buyer agreed to forgo "any claim with respect to their purported use of, *or reliance on*, any such [extra-contractual] representations, warranties or statements (including by omission)."[196] As noted, Buyer made no comparable promise in the UPA not to rely on extra-contractual representations, warranties or statements.

The OnRamp Insiders attempt to distinguish *Fontanella* by noting the agreement in that case had no representation comparable to Section 4.7.[197] But Section 4.7 does not communicate any anti-reliance commitment, much less an

---

[194] *See Abry*, 891 A.2d at 1058 ("To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners.").

[195] *Prairie Capital*, 132 A.3d at 50.

[196] 2017 WL 3421076, at *4 (Del. Ch. Aug. 9, 2017) (emphasis provided).

[197] Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss ("RB") 16.

unambiguous one. While Buyer represents in that provision that it had formed an "independent judgment" about the Company, it also states it was "provided with [requested] information about the Company and its business and operations" to reach that judgment.[198] As Buyer notes, this clause reasonably can be read to reflect that Buyer was expressly representing it *did rely* on extra-contractual information.[199]

In the absence of an unambiguous anti-reliance provision, it cannot be said as a matter of law that Buyer promised in the UPA not to bring its fraudulent inducement claim. That claim, for now, survives.

### 2. Fraud/Breach of Contract Bootstrapping

The OnRamp Insiders next invoke the rule that fraud claims cannot be bootstrapped to breach of contract claims as a separate ground to argue that Buyer's

---

[198] UPA § 4.7 (the provision makes no attempt to identify the information Buyer had been given or to describe it as contractual or extra-contractual).

[199] The OnRamp Insiders argue the Agreement in *Prairie Capital* contains "substantially similar language[,]" and this Court should therefore reach the same result as the *Prairie Capital* court. RB 17. But, the provision in *Prairie Capital* was considerably different. It included no language about the buyer being "provided with [] information about the Company and its business and operations as it has requested." UPA § 4.7; *see Prairie Capital*, 132 A.3d at 50. Instead, that provision notes, "[i]n making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the [sellers] expressly and specifically set forth in this Agreement, including the Schedules." *Id.* Later in that same provision, the buyer explicitly acknowledges that it "understands, acknowledges and agrees, that all other representations and warranties of any kind . . . are specifically disclaimed by the [sellers]." *Id.* Far from being "substantially similar," these differences make the contract in *Prairie Capital* inapposite.

fraud claims must be dismissed.[200]  Generally stated, "[f]or both a breach-of-contract claim and a tort claim to coexist in a single action, the plaintiff must allege that the defendant breached a duty that is independent of the duties imposed by the contract."[201]  Accordingly, "one cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations."[202]  "In other words, a plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint or alleging that the defendant never intended to comply with the agreement at issue at the time the parties entered into it."[203]

As a general rule, the bootstrapping bar makes perfect sense.  When a party claims he was fraudulently induced into entering a contract by promises that were then included in the negotiated language of that very contract, his remedy should be in contract, not tort.  Both claims lead to the same destination—a remedy in damages causally related to the broken promises.

---

[200] OB 26–29.

[201] *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *3 (Del. Super. Ct. Mar. 21, 2017) (quotation omitted).

[202] *Iotex Comm'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998).

[203] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *17 (Del. Ch. Dec. 30, 2010).

While our courts do not hesitate to dismiss bootstrapped fraud claims, our courts also recognize that the bootstrap rule is not absolute. For instance, in *Abry*, the court held that where, as here, the plaintiff seeks a remedy for fraud based in rescission, or rescissory damages, not compensatory damages, the plaintiff/buyer may plead a fraud claim next to a breach of contract claim if he can plead "either: (1) that the Seller knew that the Company's contractual representations and warranties were false; or (2) that the Seller itself lied to Buyer about a contractual representation and warranty."[204]

Buyer's so-called contractual fraud claims fall within the *Abry* exception. Specifically, Buyer alleges the OnRamp Insiders knew the representations included in Sections 2.6, 2.10, 2.11 and 2.20 were false, and yet made them anyway.[205] And Buyer has explicitly prayed for rescission of the UPA to remedy the alleged fraud, a remedy the UPA forbids for breach of contract claims.[206] As the *Abry* court

---

[204] *Abry*, 891 A.2d at 1064; *see also 3M Co. v. Neology, Inc.*, 2019 WL 2714832, at *14 (Del. Super. Ct. June 28, 2019) (holding that fraud claim was not impermissibly bootstrapped where plaintiff was seeking rescissory damages, "which are a remedy for fraud, not breach of contract"); *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020) (noting that "*Abry* supports the conclusion that a contractual limitation on damages opens the door to parallel breach of contract and fraud claims.").

[205] Compl. ¶¶ 47–48, 62, 80, 96.

[206] Compl. ¶ 99; UPA § 7.13 (limiting the remedy for breach of the UPA to indemnification up to specified caps).

recognized, to hold that Buyer can recover only capped damages for knowingly false contractual representations would be to countenance and immunize fraud.[207]

### 3. Chancery Rule 9(b)

To the extent their contract-based and bootstrapping arguments do not carry the day, the OnRamp Insiders maintain that Buyer's fraud claims still must be dismissed because they have not been pled with the factual particularity required by Court of Chancery Rule 9(b).[208] Not surprisingly, Buyer disagrees.[209]

The elements of fraud in Delaware are: (1) a false representation of material fact or omission of fact that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false when made or was recklessly indifferent to the truth; (3) the defendant intended to induce the plaintiff to act; (4) the plaintiff in fact acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[210] Court of Chancery Rule 9(b) requires factual

---

[207] *Abry*, 891 A.2d at 1064.

[208] OB 32–39; *see* Del. Ct. Ch. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

[209] AB 37–38.

[210] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005).

allegations in support of four of the five *prima facie* elements of fraud to be pled with particularity.[211] Knowledge may be "averred generally."[212]

When evaluating whether a plaintiff who was the direct recipient of an allegedly fraudulent overture has met his enhanced pleading burden for fraud under Rule 9(b), this court has observed that the complaint should specify "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[213] While the failure to plead these so-called "newspaper facts" can be excused in circumstances where the plaintiff would have no way to know that level of detail in advance of bringing the claim,[214] it is reasonable to expect a counter-

---

[211] Del. Ct. Ch. R. 9(b).

[212] *Id.*

[213] *Abry*, 891 A.2d at 1050.

[214] *See LVI Gp. Invs., LLC v. NCM Gp. Hldgs, LLC,* 2017 WL 1174438, at *4 (Del. Ch. Mar. 29, 2017) (noting that a failure to plead newspaper facts will not, as a matter of law, be "fatal" to a fraudulent misrepresentation claim); *Yavar Rzayev, LLC v. Roffman*, 2015 WL 5167930, at *4 (Del. Super. Ct. Aug. 31, 2015) ("Delaware courts have adopted the reasoning of the Third Circuit in [*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984)] and consistently found that the date, place, and time allegations are not required so long as the pleadings put defendants on notice of the misconduct with which they are charged and protect defendants against false charges of immoral or fraudulent behavior.); *Sammons v. Hartford Underwriters Ins. Co.*, 2010 WL 1267222, at *4 (Del. Super. Ct. Apr. 1, 2010) ("an excessive focus on particularity . . . could impair the flexibility and the just determination of cases.").

party in contractual negotiations to be able to back a fraud claim related to the contract with detailed factual allegations.

Buyer has cleared Rule 9(b)'s particularity hurdle here. The Complaint identifies how the contractual representations concerning Yeti were false when made.[215] To support these allegations, it alleges *who* communicated with Yeti employees, *who*, in turn, communicated the false information regarding Yeti to Buyer, *when* these communications occurred, *what* was communicated and *why* the OnRamp Insiders were motivated to lie.[216] Each of these pled facts support the allegations that the UPA contained material misstatements, and put the OnRamp Insiders on notice of the claims against them.

The same is true for the allegations that the Salesforce pipeline was manipulated and the interim financial statements were fraudulent. The Complaint specifically alleges *who* manipulated the Salesforce data, *what* data was manipulated, *when* the data was changed and *why* the OnRamp Insiders were motivated to lie.[217] Likewise, the Complaint alleges *what* accounts were uncollectible, *when* the OnRamp Insiders likely knew those accounts could not be collected and *why* they would, nonetheless, include them as revenue and accounts

---

[215] Compl. ¶¶ 38–49.

[216] *Id.*

[217] Compl. ¶¶ 52–80.

receivable on the interim financial statements.[218]  This is more than enough to put the OnRamp Insiders on notice of the specific misconduct with which they are charged.[219]

### E. Aiding and Abetting and Conspiracy

Buyer claims the OnRamp Insiders both aided and abetted each other's fraud and conspired to commit fraud.[220]  The OnRamp Insiders respond that the aiding and abetting and conspiracy claims must be dismissed, even if the underlying fraud claims survive, because "officers and agents of a single business entity cannot aid and abet or conspire with each other in the commission of a tort."[221]

Whether a corporation can conspire with its subsidiaries, affiliates or agents is an area of law that, "both inside and outside of Delaware, is more characterized by confusion than clarity."[222]  This court has, in the past, offered somewhat mixed guidance on the issue.  In *In re Transamerica Airlines, Inc.*[223] this court held that "a corporation generally cannot be deemed to have conspired with its wholly owned

---

[218] *Id.*

[219] *Kahn Bros. & Co., Inc. Profit Sharing Plan and Trust v. Fishbach Corp.*, 1989 WL 109406, at *4 (Del. Ch. Sept. 14, 1989).

[220] Compl. ¶¶ 100–09.

[221] OB 41.

[222] *Allied Capital*, 910 A.2d at 1037.

[223] 2006 WL 587846 (Del. Ch. Feb. 28, 2006).

subsidiary, or its officers and agents."[224]  A few months later, however, in *Allied Capital*, this court declined to hold that, "as a *per se* matter, commonly-controlled [] business entities cannot conspire with one another and be held liable for acting in concert to pursue unlawful activity that causes damage."[225]

Not surprisingly, Buyer likes *Allied Capital*.  But that case decided the issue on facts not present here.[226]  The plaintiff in *Allied Capital* alleged a conspiracy among a "myriad of [defendant]-controlled affiliates as well as . . . those entities' directors and officers."[227]  In rejecting a *per se* rule that a parent cannot conspire with its subsidiaries, the court was motivated, in large part, by a view that such a rule would ignore that "our corporation law is largely built on the idea that separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control."[228]

Unlike *Allied Capital*, Buyer here does not allege a conspiracy among a company and its subsidiaries or affiliates; it alleges aiding and abetting and

---

[224] *Id.* at *6; *see also Am. Capital Acquisition P'rs, LLC v. LPL Hldgs., Inc.*, 2014 WL 354496, at *12 (Del. Ch. Feb. 3, 2014) (holding that the "general rule that a corporation cannot conspire with its wholly-owned subsidiaries and officers must apply.").

[225] *Allied Capital*, 910 A.2d at 1037.

[226] AB 46.

[227] *Allied Capital*, 910 A.2d at 1036.

[228] *Id.* at 1038.

52

conspiracy only against and among the individual OnRamp Insiders.[229]  These claims, directed at the officers of a limited liability company, do not implicate the issues of corporate separateness that caused the *Allied Capital* court to reject a *per se* rule.  Buyer's reliance on *Allied Capital* is, therefore, misplaced.

"It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."[230]  Accordingly, it is entirely sensible that, as a general rule, agents of a corporation cannot conspire with one another or aid and abet each other's torts.[231]  The only instance where this general rule will not apply is when a corporate officer "steps out of her corporate role and acts pursuant to personal motives."[232]

---

[229] Compl. ¶¶ 100–09.

[230] *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *7 (Del. Ch. Mar. 3, 2005) (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F. 2d 911, 914 (5th Cir. 1952)).

[231] *See Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *11 (Del. Super. Ct. June 6, 2012) ("A corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents . . . And, like civil conspiracy, officers and agents cannot aid and abet their principal or each other in the commission of a tort.") (quotation omitted).

[232] *In re Transamerica*, 2006 WL 587846, at *6.

The allegations in the Complaint offer no basis to depart from the "basic law of conspiracy" or aiding and abetting.[233] The OnRamp Insiders are alleged to have committed fraud to inflate the value of OnRamp or earn a bonus.[234] A corporate officer does not step out of his corporate role unless he "seeks to gain a benefit independent of their financial interest resulting from their employment by or investment in [their employer]."[235] As Buyer has not alleged the OnRamp Insiders acted for any reason other than inflating the value of OnRamp for their principal, there is no basis to depart from the general rule that "the acts of the agent are the acts of the corporation."[236] Buyer's aiding and abetting and conspiracy claims, therefore, must be dismissed.[237]

---

[233] *Amaysing Techs.*, 2005 WL 578972, at *7; *see Allied Capital*, 910 A.2d at 1038 ("[O]ur state courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.").

[234] Compl. ¶ 97.

[235] *Amaysing Techs.*, 2005 WL 578972, at *8; *see Coulbourne v. Rollins Auto Leasing Corp.*, 392 F. Supp. 1198, 1201 (D. Del. 1975) (finding an employee was not acting for personal reasons because "the expectation of a commission is the only basis to distinguish him from the corporation . . . .").

[236] *Amaysing Techs.*, 2005 WL 578972, at *7.

[237] *See Cornell Glasgow*, 2012 WL 2106945, at *11 (dismissing conspiracy and aiding and abetting claims in tandem).

## F. Unjust Enrichment

In Count VIII, Buyer alleges each Defendant was unjustly enriched by the inflated sales price of OnRamp.[238] Defendants respond that the unjust enrichment claim must be dismissed because an unjust enrichment claim cannot lie when the parties' relationship is controlled by an enforceable contract.[239] Buyer fires back that its unjust enrichment claim can proceed as an alternative theory of liability because the Complaint seeks to rescind the UPA based on fraud.[240]

Defendants are correct that unjust enrichment claims generally will be dismissed as duplicative when there is an enforceable contract that governs a relationship.[241] But, Buyer here maintains that the underlying contract should be rescinded on the basis of fraud.[242] "Although merely suggesting that the validity of a contract may be in doubt is insufficient to support a claim for unjust enrichment, a claim that the underlying agreement is subject to rescission due to fraudulent conduct

---

[238] Compl. ¶ 126.

[239] OB 42.

[240] AB 47.

[241] *Bakerman v. Sidney Frank Importing Co. Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, [] a claim for unjust enrichment will be dismissed.").

[242] Compl. ¶ 99.

or omissions is sufficient to do so."[243]  Having well-pled fraud that might support

rescission, Buyer's unjust enrichment claim cannot be dismissed.

## G. Conversion

Last, Buyer alleges the OnRamp Insiders "converted" the $106 million

purchase price because they have no right to that money.[244]  On its face, this claim

fails as a matter of law.  It is settled in Delaware that "an action in conversion will

not lie to enforce a claim for the payment of money."[245]  Although Delaware law has

not formally recognized any exceptions to this rule, other states allow an exception

for allegations that a defendant converted money "only when [the money] can be

described or identified as a specific chattel, but not where an indebtedness may be

discharged by the payment of money generally."[246]  Assuming, for the sake of

argument, this exception would be recognized in Delaware, it is clearly inapplicable.

There is nothing distinctive about the money Buyer paid for OnRamp that would

---

[243] *Haney v. Blackhawk Network Hldgs., Inc.*, 2016 WL 769595, at *9 (Del. Ch. Feb. 26, 2016).  Defendants half-heartedly protest that Buyer's rescission claim is merely "an artful way of asking for damages." RB 23 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 160 n.93 (Del. Ch. 2004)).  But, as discussed above, it is at least conceivable that Buyer will be able to prove the UPA was the product of fraud.  And, because fraud is a common ground for rescission, it is then conceivable Buyer will be able to prove at trial the contract must be rescinded.  *See Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982).  No greater showing is required at the pleading stage.

[244] Compl. ¶ 132.

[245] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 889–90 (Del. Ch. 2009).

[246] *Id.* at 890.

justify a characterization of that money as a "unique chattel." Buyer, no doubt, will be glad to accept Defendants' money from wherever it might be sourced should Buyer prove its case and achieve an award of damages. Accordingly, Buyer's conversion claim must be dismissed.

## III. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss Counts II, IV, V, VII and IX–XIII of the Complaint is **GRANTED**. Their Motion to Dismiss Counts I, III, VI and VIII is **DENIED**.

**IT IS SO ORDERED.**